UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| JUAN CARLOS CALDERON, | No. 2:23-cv-2049 WBS CSK P |
| Plaintiff, | |
| v. | ORDER AND |
| P. COVELLO, et al., | FINDINGS & RECOMMENDATIONS |
| Defendants. | |

Plaintiff is a state prisoner proceeding pro se and in forma pauperis with a civil rights action pursuant to 42 U.S.C. § 1983. Pending before the Court are defendant Campos' summary judgment motion and several motions filed by plaintiff. For the reasons discussed below, this Court recommends that defendant's summary judgment motion be granted and plaintiff's motion for transfer, construed as a motion for injunctive relief, be denied. For the reasons discussed below, this Court orders plaintiff's other motions denied.

**I.      AMENDED COMPLAINT**

This action proceeds on the first amended complaint as to defendant Mule Creek State Prison ("MCSP") Correctional Officer Campos. (ECF No. 10.) Plaintiff claims that on June 7, 2023, defendant Campos violated the Eighth Amendment by throwing a grenade/bomb under plaintiff's cell door without cause and failing to offer medical care for the injuries caused to plaintiff by exposure to the grenade/bomb. (Id. at 5.) Plaintiff claims that defendant Campos did

1

not open plaintiff's cell door until twenty minutes after the grenade/bomb exploded and did not offer decontamination to plaintiff.  (Id.)  Plaintiff claims that defendant Campos faked an altercation between inmates in order to explode the grenade/bomb in plaintiff's cell.  (Id. at 6.)

This action proceeds on the following claims: (1) defendant Campos used excessive force in violation of the Eighth Amendment when he allegedly exploded the grenade/bomb under plaintiff's cell door without cause and failed to open the cell door for twenty minutes; and (2) defendant Campos violated the Eighth Amendment by failing to provide plaintiff with medical care following the explosion of the grenade/bomb.  (ECF No. 16.)

## II.    LEGAL STANDARDS FOR SUMMARY JUDGMENT

Summary judgment is appropriate when it is demonstrated that the standard set forth in Federal Rule of Civil Procedure 56 is met.  "The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).

> Under summary judgment practice, the moving party always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any," which it believes demonstrate the absence of a genuine issue of material fact.

Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986) (quoting then-numbered Fed. R. Civ. P. 56(c).)  "Where the nonmoving party bears the burden of proof at trial, the moving party need only prove that there is an absence of evidence to support the non-moving party's case."  Nursing Home Pension Fund, Local 144 v. Oracle Corp. (In re Oracle Corp. Sec. Litig.), 627 F.3d 376, 387 (9th Cir. 2010) (citing Celotex Corp., 477 U.S. at 325); see also Fed. R. Civ. P. 56 advisory committee notes to 2010 amendments (recognizing that "a party who does not have the trial burden of production may rely on a showing that a party who does have the trial burden cannot produce admissible evidence to carry its burden as to the fact").  Indeed, summary judgment should be entered, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial.  Celotex Corp., 477 U.S. at 322.

2

"[A] complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." Id. at 323.

Consequently, if the moving party meets its initial responsibility, the burden then shifts to the opposing party to establish that a genuine issue as to any material fact actually exists. See Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986). In attempting to establish the existence of such a factual dispute, the opposing party may not rely upon the allegations or denials of its pleadings, but is required to tender evidence of specific facts in the form of affidavits, and/or admissible discovery material in support of its contention that such a dispute exists. See Fed. R. Civ. P. 56(c); Matsushita, 475 U.S. at 586 n.11. The opposing party must demonstrate that the fact in contention is material, i.e., a fact that might affect the outcome of the suit under the governing law, see Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986); T.W. Elec. Serv., Inc. v. Pacific Elec. Contractors Ass'n, 809 F.2d 626, 630 (9th Cir. 1987), and that the dispute is genuine, i.e., the evidence is such that a reasonable jury could return a verdict for the nonmoving party, see Wool v. Tandem Computers, Inc., 818 F.2d 1433, 1436 (9th Cir. 1987), overruled on other grounds as stated in Flood v. Miller, 35 F. App'x 701, 703 n.3 (9th Cir. 2002).

In the endeavor to establish the existence of a factual dispute, the opposing party need not establish a material issue of fact conclusively in its favor. It is sufficient that "the claimed factual dispute be shown to require a jury or judge to resolve the parties' differing versions of the truth at trial." T.W. Elec. Serv., 809 F.2d at 630. Thus, the "purpose of summary judgment is to 'pierce the pleadings and to assess the proof in order to see whether there is a genuine need for trial.'" Matsushita, 475 U.S. at 587 (quoting Fed. R. Civ. P. 56(e) advisory committee's notes to 1963 amendments).

In resolving a summary judgment motion, the court examines the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any. Fed. R. Civ. P. 56(c). The evidence of the opposing party is to be believed. See Anderson v. Liberty Lobby, 477 U.S. at 255. All reasonable inferences that may be drawn from the facts placed before the court must be drawn in favor of the opposing party. See Matsushita, 475 U.S. at 587.

3

Nevertheless, inferences are not drawn out of the air, and it is the opposing party's obligation to produce a factual predicate from which the inference may be drawn. See Richards v. Nielsen Freight Lines, 602 F. Supp. 1224, 1244-45 (E.D. Cal. 1985), aff'd, 810 F.2d 898, 902 (9th Cir. 1987). Finally, to demonstrate a genuine issue, the opposing party "must do more than simply show that there is some metaphysical doubt as to the material facts. . . . Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no 'genuine issue for trial.'" Matsushita, 475 U.S. at 586 (citation omitted).

By notice filed on December 1, 2025, plaintiff was advised of the requirements for opposing a motion brought pursuant to Rule 56 of the Federal Rules of Civil Procedure. (ECF No. 88-5) (citing Rand v. Rowland, 154 F.3d 952, 957 (9th Cir. 1998) (en banc).).

## III.    DEFENDANT'S SUMMARY JUDGMENT MOTION

### A.    Legal Standards

#### 1.    Excessive Force

"In its prohibition of 'cruel and unusual punishments,' the Eighth Amendment places restraints on prison officials, who may not . . . use excessive physical force against prisoners." Farmer v. Brennan, 511 U.S. 825, 832 (1994). "[W]henever prison officials stand accused of using excessive physical force in violation of the [Eighth Amendment], the core judicial inquiry is . . . whether force was applied in a good-faith effort to maintain or restore discipline, or maliciously and sadistically to cause harm." Hudson v. McMillian, 503 U.S. 1, 6-7 (1992). Five factors bear on the excessive force analysis in a typical Eighth Amendment claim: "(1) the extent of injury suffered by an inmate; (2) the need for application of force; (3) the relationship between that need and the amount of force used; (4) the threat reasonably perceived by the responsible officials; and (5) any efforts made to temper the severity of a forceful response." Furnace v. Sullivan, 705 F.3d 1021, 1028 (9th Cir. 2013) (quoting Martinez v. Stanford, 323 F.3d 1178, 1184 (9th Cir. 2003)). While de minimis uses of physical force generally do not implicate the Eighth Amendment, significant injury need not be evident in the context of an excessive force claim, because "[w]hen prison officials maliciously and sadistically use force to cause harm, contemporary standards of decency always are violated." Hudson, 503 U.S. at 9.

2.        Inadequate Medical Care

The Constitution requires prison officials to provide inmates with reasonably adequate medical care. See Estelle v. Gamble, 429 U.S. 97, 103 (1976).  To hold an official liable for violating this duty under the Eighth Amendment, the inmate must satisfy two prongs, an objective prong and subjective prong.  First, the inmate must suffer from a serious medical need (the objective prong); and second, the official must be deliberately indifferent to the inmate's serious medical need (the subjective prong).  See Snow v. McDaniel, 681 F.3d 978, 985 (9th Cir. 2012), overruled in part on other grounds by, Peralta v. Dillard, 744 F.3d 1076, 1082-83 (9th Cir. 2014).  A medical need is "serious" if the failure to treat "could result in further significant injury or the unnecessary and wanton infliction of pain." Jett v. Penner, 439 F.3d 1091, 1096 (9th Cir. 2006) (internal citations omitted).

The "second prong—defendant's response to the need was deliberately indifferent—is satisfied by showing (a) a purposeful act or failure to respond to a prisoner's pain or possible medical need and (b) harm caused by the indifference." Id. (internal citations omitted).  This standard requires that the prison official must not only "be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists," but that person "must also draw the inference." Farmer, 511 U.S. at 837.  This "subjective approach" focuses only "on what a defendant's mental attitude actually was (or is), rather than what it should have been (or should be)..." Farmer, 511 U.S. at 839.  Deliberate indifference is a higher standard than medical negligence or malpractice, and a difference of opinion between medical professionals—or between a physician and the prisoner—generally does not amount to deliberate indifference. See Toguchi v. Chung, 391 F.3d 1051, 1060 (9th Cir. 2004).

Neither will an "inadvertent failure to provide medical care" sustain a claim. See Estelle, 429 U.S. at 105.  Misdiagnosis alone is not a basis for a claim, see Wilhelm v. Rotman, 680 F.3d 1133, 1123 (9th Cir. 2012), and a "mere delay" in treatment, "without more, is insufficient to state a claim of deliberate medical indifference," Shapley v. Nevada Bd. of State Prison Comm'rs, 766 F.2d 404, 407 (9th Cir. 1985).  Instead, a prisoner must show that a delay "would cause significant harm and that defendants should have known this to be the case." Hallett v. Morgan,

5

296 F.3d 732, 746 (9th Cir. 2002).

3.    Excessive Force Claim by Bystander

In the summary judgment motion, defendant cites Craver v. Hasty, 2013 WL 1178225 (E.D. Cal. Mar. 21, 2013), findings and recommendations adopted, 2013 WL 1759674 (E.D. Cal. Apr. 24, 2013), and Thomas v. Mendez, 2009 WL 89116 (C.D. Cal. Jan. 13, 2009).  (ECF No. 88 at 14.)  As discussed below in Craver, these cases address whether a bystander to alleged excessive force can state an Eighth Amendment claim.  In Craver, in evaluating qualified immunity, the court noted,

> The undersigned first observes that while defendants may not have intended to harm plaintiff when they sprayed the O.C. spray, that fact does not give rise to a constitutional violation. "[T]he Eighth Amendment does not require a further showing that the intent to punish needs to be directed at a specific individual." Robins v. Meecham, 60 F.3d 1436, 1440 (9th Cir.1995). The inquiry is not whether the use of O.C. spray was excessive as to plaintiff, but rather whether the use of O.C. spray was excessive at all. "Excessive force directed at one prisoner can also establish a cause of action for harm that befalls other prisoners." Clement v. Gomez, 298 F.3d 898, 905 n. 3 (9th Cir.2002) (citing Robins v. Meecham, 60 F.3d 1436, 1441– 42 (9th Cir.1995). The converse, then, must also be true: if force directed at one prisoner was not "excessive," then harm befalling a nearby prisoner could not establish a cause of action as to him. See Thomas v. Mendez, 2009 WL 89116, at *5 (C.D. Cal. Jan.13, 2009) ("plaintiff does not contend that the force used by the officers was excessive as to [his cellmate]; he only contends that it was excessive as to him. Under Robins, this is not enough to state an Eighth Amendment excessive force claim").

2013 WL 1178225, at *6.

In the instant action, plaintiff alleges that defendant Campos fabricated the fight between the other inmates and threw the O.C. grenade in plaintiff's cell.  Based on these allegations, this Court finds that plaintiff is not claiming that he was a bystander to excessive force, as discussed by the courts in Craver and Thomas.  Accordingly, this Court considers the five factors for evaluating excessive force claims laid out by the Ninth Circuit in Furnace as applied to plaintiff.

**B.    Clarification of Plaintiff's Opposition Pleadings**

Defendant filed his summary judgment motion on December 1, 2025.  (ECF No. 88.)

/ / /

/ / /

6

Plaintiff's opposition was due Monday December 29, 2025.[1]  Plaintiff filed various pleadings which appear to address defendant's summary judgment motion.  This Court clarifies which of these pleadings this Court considers in evaluating defendant's summary judgment motion.

Pursuant to the mailbox rule, on December 16, 2025, plaintiff filed a pleading docketed as an opposition to defendant's summary judgment motion.  (ECF No. 93 at 44.)  Pursuant to the mailbox rule, on December 19, 2025, plaintiff filed a pleading docketed as "Notice re: no doctor available."  (ECF No. 94 at 24.)  Both of these pleadings address defendant's summary judgment motion.  While the Court does not generally permit piecemeal filings of oppositions to summary judgment motions, the Court will consider these documents in evaluating defendant's summary judgment motion.

Plaintiff filed various pleadings after December 29, 2025 which address defendant's summary judgment motion, at least in part.  (See ECF Nos. 95[2], 96, 98, 99, 100.)  To the extent these pleadings address defendant's summary judgment motion, they are untimely as they were filed after December 29, 2025.[3]

Defendant did not file a reply to plaintiff's oppositions.  (See Docket.)

## C.   Excessive Force Claim

### 1.   Defendant's Motion

Defendant claims that he used appropriate force to stop a prison flight.  (ECF No. 88 at 13-19.)

---

[1]  Plaintiff had 24 days from December 1, 2025 to file a timely opposition.  See Local Rule 230(l) (in prisoner actions, oppositions due not more than twenty-one days after date service of the motion); Fed. R. Civ. P. 6(d) (3 days are added to time to act when service by mail).  The due date for plaintiff's opposition fell on Thursday December 25, 2025 (Christmas) and Friday December 26, 2025 was a court holiday.  Therefore, plaintiff's opposition was due on Monday December 29, 2025.  See Fed. R. Civ. P. 6(a).

[2]  Plaintiff attaches to ECF No. 95 a proof of service indicating that this pleading was filed, pursuant to the mailbox rule, on December 28, 2025.  (ECF No. 95 at 20.)  However, plaintiff attaches another proof of service to this pleading indicating that he filed this pleading, pursuant to the mailbox rule, on December 31, 2025.  (Id. at 95.)  This document also contains a signature by plaintiff dated December 31, 2025.  (Id. at 25.)  Because plaintiff signed this pleading on December 31, 2025, this Court finds that this pleading was filed on December 31, 2025.

[3]   In an abundance of caution, this Court reviewed these pleadings and determined that they contained no evidence supporting plaintiff's opposition.

> a.    *Injuries*

Defendant argues that plaintiff's injuries do not suggest that excessive force was used. (Id. at 14.)  Defendant states that plaintiff claims that he suffered a burning sensation on his body immediately after exposure to the Oleoresin Capsicum ("O.C.") (or pepper spray) powder that came from the O.C. grenade deployed by defendant.  (Id. (see undisputed fact no 34).)  Defendant argues that this cannot be characterized as anything more than a de minimis injury.  (Id. at 14-15.)  Defendant argues that the record does not support plaintiff's claim (made in his deposition and oppositions) that exposure to O.C. powder caused pain in his kidneys and lungs months after the incident.  (Id. at 15 (see undisputed fact no. 37).)  Defendant refers to the September 20, 2024 response to plaintiff's health care grievance submitted on June 20, 2024 claiming that he suffered injuries as a result of the June 7, 2023 incident, including lung problems.  (ECF No. 67 at 15.)  The response to this grievance states that plaintiff's health records do not reflect an incident requiring health care services being reported to health care staff on or around June 7, 2023.  (Id. at 67.)  The response states that on June 9, 2023, plaintiff was seen and evaluated by a primary care provider who noted that plaintiff did not appear to be in any acute distress, plaintiff walked into the clinic with a normal gait, and was able to sit on the exam table without any difficulty.  (Id.)  The response states that there is no indication that plaintiff reported concerns related to injuries sustained in a grenade explosion in his cell during this encounter.  (Id.)  The response also states that on September 12, 2024, plaintiff was seen by his primary care provider.  (Id.)  During that visit, plaintiff denied any cough, wheezing, hemoptysis, shortness of breath, fatigue, tiredness and chest pain at rest or exertion.  (Id.)  The response states that there was no indication that plaintiff reported concerns regarding lung or kidney damage, respiratory issues, or syncope during this encounter.  (Id.)

Defendant also argues that any burning sensation plaintiff felt during the twenty minute gap between securing the scene and his release from his cell to receive decontamination does not suggest that force was used maliciously or sadistically to cause harm.  (Id.)  Defendant argues that plaintiff received decontamination as soon as it was practical to do so.  (Id. (see undisputed fact no. 29).)

b.      *Need for Application of Force*

Defendant argues that the force used was necessary to stop a prison fight. (Id. at 16.)  On June 7, 2023, at approximately 3:42 p.m., defendant Campos was monitoring yard recall when he observed two inmates fighting each other in the dayroom in Facility A. (Id. at 16 (see undisputed fact no. 3).)  Upon observing the fight, defendant Campos immediately notified the prison's Central Control using his institutional radio. (Id. (see undisputed fact no. 4).)  Defendant Campos called a "Code 1," meaning a one-on-one inmate fight. (Id. (see undisputed fact no. 4).)  After calling the Code 1 on his institutional radio, Officer Campos gave multiple verbal orders for both inmates to get down, but the inmates continued to fight. (Id. at 3 (see undisputed fact no. 5).)  In order to stop the ongoing physical harm and because the inmates had not obeyed his verbal orders, consistent with his training, defendant Campos tossed one O.C. grenade towards the fighting inmates. (Id. (see undisputed fact no. 6).)  Defendant Campos used an underhand toss from approximately 10 feet away, aiming at the feet of the fighting inmates. (Id. (see undisputed fact no. 6).)  The O.C. grenade landed and discharged on the dayroom floor approximately two feet away from the fighting inmates' feet and in front of cells 113, 114 and 115. (Id. (see undisputed fact no. 6).)

Defense use of force expert Sergeant Watson, an In-Service Training Sergeant at MCSP, reviewed relevant documents and California Department of Corrections and Rehabilitation ("CDCR") policies in effect at the time of the incident. (Id. at 7 (see undisputed fact no. 19).)  Sergeant Watson determined that defendant Campos' deployment of one O.C. grenade during the June 7, 2023 incident involving two fighting inmates was in accordance with CDCR policy and procedure. (Id. (see undisputed fact no. 19).)  Force was necessary and reasonable as fighting between inmates in prison poses an imminent threat that jeopardies the safety of inmates and staff and compromises the security of the institution, requiring immediate action to stop the threat. (Id. (see undisputed fact no. 20).)  CDCR policy in effect at the time of the incident permitted correctional officers to choose the force option they reasonably believe is sufficient and did not require correctional officers to utilize use of force options in a particular sequence. (Id. (see undisputed fact no. 21).)  Sergeant Watson determined that Officer Campos' use of on O.C.

9

grenade after the fighting inmates ignored multiple verbal orders to get down was reasonable and consistent with CDCR's policy of using chemical agents during immediate use of force.  (Id.  (see undisputed fact no. 22).)  Sergeant Watson determined that deploying an O.C. grenade under these circumstances was the safer and more effective option to stop the fight because the O.C. grenade allows an officer to maintain a safer distance from the inmates while still effectively dispersing the chemical agent.  (Id. (see undisputed fact no. 22).)  In contrast, approaching actively fighting inmates to apply direct pepper spray would have posed a significant risk of injury to the officer and could have prolonged the fight.  (Id. (see undisputed fact no. 22).)  Defendant also observes that California regulations require that "[w]hen inmates fight, the participants must be separated at once."  (Id. at 16 (quoting Cal. Code Regs. tit. 15, § 3286)).

c.      *Relationship Between Need and Force Used*

Defendant argues that the third factor--need for a forceful response and the amount of force used--favors defendant.  (Id. at 17.)  Defendant argues that he resorted to using force after verbal orders failed to stop the fight and end the threat.  (Id. (see undisputed facts no. 4-6).)  Defendant Campos stopped using force when the fighting inmates complied.  (Id. (see undisputed fact no. 9).)  While plaintiff testified at his deposition that defendant Campos should have used pepper spray instead of the O.C. grenade (Id. (see undisputed fact no. 14)), defendant argues that plaintiff's disagreement with defendant Campos' tactical decision does not establish that the force used was disproportionate to the need to use force.  (Id.)  Because the fighting inmates were located in the dayroom, with most of the other inmates inside their cells with their cell doors closed, defendant Campos determined that the safest option to ensure that the inmates did not cause further harm to one another, while also allowing defendant to maintain distance from the two fighting inmates, was for him to use an O.C. grenade as opposed to other force options available to him, including a canister of pepper spray or a baton.  (Id. (see undisputed fact no. 8).)  Defendant observes that use of force expert Watson opined that deploying the O.C. grenade under these circumstances was the safer and more effective option to stop the fight because the O.C. grenade allows an officer to maintain a safer distance from the inmates while still effectively dispersing a chemical agent.  (Id. (see undisputed fact no. 22).)  Use of force expert Watson

10

opined that approaching actively fighting inmates to apply direct pepper spray would have posed a significant risk of injury to defendant Campos and could have prolonged the fight. (Id. (see undisputed fact no. 22).)

### d.    Perceived Threat

Defendant argues that the fourth factor--the threat reasonably perceived--weighs in his favor. (Id. at 18.) Defendant reasonably perceived the two inmates fighting as an imminent threat to safety and security of the prison after they ignored orders to get down. (Id. (see undisputed facts nos. 5-6).) The fight and ongoing threat only stopped after defendant Campos deployed an O.C. grenade. (Id. (see undisputed fact no. 9).) Defendant argues that under these circumstances, defendant reasonably perceived that the incident was dangerous and that force was necessary to stop it. (Id.)

### e.    Efforts to Temper Severity of Forceful Response

Defendant argues that the fifth factor—efforts made to temper the severity of a forceful response—weighs in his favor. (Id.) Defendant gave multiple verbal orders for the inmates to stop fighting and get down to no avail. (Id. (see undisputed fact no. 5).) Faced with the inmates' refusal to comply with lawful orders, defendant resorted to deploying a single O.C. grenade, using an underhand toss, from approximately 10 feet away, aimed at the feet of two fighting inmates. (Id. (see undisputed fact no. 6).) This was the safest option to prevent further harm to the fighting inmates, control the situation, and protect himself against recalcitrant inmates. (Id. (see undisputed facts nos. 7, 8).)

### 2.    Plaintiff's Opposition

In the opposition filed December 16, 2025, plaintiff argues that he suffered various injuries due to the June 7, 2023 incident including a hernia, stomach ulcers, throat infection, and severely damaged lung and kidneys. (ECF No. 93 at 3.) Plaintiff attaches no evidence to support this claim. In the opposition filed December 19, 2025, plaintiff also claims that he suffered various injuries due to the June 7, 2023 incident including intestinal dysfunction, severe pain in his lungs, kidneys, joints and stomach. (ECF No. 94 at 1.) Plaintiff attaches no evidence to support this claim.

11

3.      Discussion

a.      *Plaintiff's Injuries*

Plaintiff appears to claim that he suffered short term injuries, i.e., a burning sensation on his body, and long term injuries, i.e., damage to his lungs and kidneys, etc., as a result of exposure to the O.C. grenade. Defendant argues that the only injury plaintiff suffered was a burning sensation on his body after exposure to the OC powder. In support of this claim, defendant cites plaintiff's deposition testimony. (ECF No. 88-1 at 13 (undisputed fact no. 34).) At his deposition, plaintiff testified that he suffered a burning sensation. (Plaintiff's depo. 34:4-6.) Plaintiff also testified that he suffered pain for two weeks after the incident and that his kidneys were dying. (Id. at 35:15-16, 24.) Plaintiff testified that no doctor ever diagnosed any of his injuries as being caused by the grenade. (Id. at 37:15-17.) Plaintiff testified that the doctors and nurses do not care and laughed about his pain. (Id. at 36:8-10.) Plaintiff testified that between six months and one year after the incident, a doctor saw something wrong in plaintiff's lungs or kidneys and referred plaintiff for further treatment, which plaintiff did not receive. (Id. at pp. 37:17-25-39:19.)

This Court first considers plaintiff's claim that his exposure to the O.C. grenade caused long term injuries. As discussed above, defendant cites the September 20, 2024 response to plaintiff's health care grievance as evidence that the O.C. powder from the grenade did not cause injuries to plaintiff's kidneys and lungs after the incident. The September 20 2024 response states that there is no indication that plaintiff reported any health problems related to exposure to the O.C. grenade to his primary care doctor on June 9, 2023 or September 12, 2024. This Court finds that the response to this grievance is sufficient to meet defendant's initial summary judgment burden of demonstrating that there is no evidence that plaintiff suffered long term injuries, including to his kidneys and lungs, as a result of the O.C. grenade explosion. Plaintiff provides no evidence, such as medical records, supporting his claim that he suffered long term injuries, including to his kidneys and lungs, as a result of the O.C. grenade explosion. While plaintiff claims that no doctor ever diagnosed his alleged long term injuries as being caused by the O.C. grenade, plaintiff submits no evidence demonstrating that these injuries existed. Accordingly,

12

this Court finds that plaintiff fails to meet his summary judgment burden of demonstrating a material issue of fact as to whether he suffered long term injuries as a result of exposure to the O.C. grenade on June 7, 2023.  See Anderson, 477 U.S. at 256-57 (a plaintiff must present affirmative evidence to defeat a properly supported motion for summary judgment); Taylor v. List, 880 F.2d 1040, 1045 (9th Cir. 1989), abrogated on other grounds, Kane v. Garcia Espitia, 546 U.S. 9 (2005) ("A summary judgment motion cannot be defeated by relying solely on conclusory allegations unsupported by factual data.").

Turning to plaintiff's claim that he suffered a burning sensation on his body after being exposed to the O.C. grenade, the experience of a burning sensation after being exposed to O.C. spray does not in itself demonstrate that the amount of force used was unconstitutional.  See Cotton v. Medina, 2025 WL 953268, *5 (E.D. Cal. Mar. 31, 2025) (court found that the impacts of burning sensation in eyes and skin and lung irritation suffered by inmate after being exposed to smoke from tear used to break up fight in which inmate not involved did not raise triable issue as to whether the amount of force used amounted to constitutional violation); Provencio v. Vazquez, 2010 WL 2490937, at *8 (E.D. Cal. June 16, 2010), findings and recommendations adopted, 2010 WL 11694922 (E.D. Cal. July 22, 2010) ("If pepper spray was benign and caused no pain, it would be ineffective and would serve no purpose as tool to maintain or restore discipline. Because the purpose of the OC spray it to cause a painful, burning sensation, this is not evidence that the force used was unlawful.").  This Court finds that the burning sensation plaintiff initially experienced following his exposure to the O.C. grenade does not demonstrate that defendant Campos used excessive force.  At his deposition, plaintiff testified that he suffered pain for two weeks after the incident.  As discussed below, the undisputed evidence shows that plaintiff received decontamination after he was released from his cell and that defendant Campos did not deny plaintiff access to medical care after the incident.  In addition, the September 20, 2024 response to plaintiff's grievance states that there is no indication that plaintiff reported any health problems related to exposure to the grenade bomb when he saw his primary care doctor on June 9, 2023.  Based on this record, this Court cannot find that the pain plaintiff allegedly suffered for two weeks after the incident was caused by defendant Campos.

13

In the section of the summary judgment motion addressing the extent of plaintiff's injury, defendant also argues that any burning sensation plaintiff felt during the twenty minute gap between securing the scene and that releasing plaintiff to receive decontamination does not suggest that force was used maliciously or sadistically to cause harm. This Court will address this argument in the section addressing defendant's efforts to temper his use of force.

For the reasons discussed above, this Court finds that this factor weighs in favor of finding that defendant Campos did not use excessive force.

            b.       *Necessary Use of Force*

Defendant's evidence demonstrates that he used the O.C. grenade to stop the inmates from fighting and restore order. In the amended complaint, plaintiff claims that defendant faked the altercation and threw the O.C. grenade under the door into his cell. Plaintiff's deposition testimony contradicts these claims. Plaintiff testified that when the fight between the inmates broke out, plaintiff was in his cell watching television. (Plaintiff's depo. 23:6-8.) Plaintiff did not see the fight start. (Id. at 23:10-11.) Plaintiff knew a fight was happening when the grenade exploded. (Id. at 23:14-20.) Plaintiff testified that the spray from the grenade went into his cell but not the grenade. (Id. at 28:11-15.) When asked whether he believed that defendant tossed the grenade at the inmates to stop the fight, plaintiff testified, "I mean, I believe so." (Id. at 28:19-21.) Plaintiff later testified again that he believed that defendant tossed the grenade to stop the fight. (Id. at 42:9-11.) Plaintiff testified that after the grenade exploded, he looked out of his cell and saw the inmates who had been fighting. (Id. at 43:7-18.) This Court also observes that while plaintiff suggested that defendant threw the grenade closer to his cell rather than the fighting inmates, at his deposition plaintiff did not make this claim. When asked if it was possible that the pepper spray grenade rolled farther than the fighting inmates, plaintiff testified, "Well, if you throw it, the—why—it's possible yes. It's possible. But it's too far away, my cell, from the incident to—it has to be like, you have to be expert that one. I don't know." (Id. at 44:20-25.) This Court finds that plaintiff's deposition testimony confirms defendant's evidence showing that defendant used the O.C. grenade to stop fighting and restore order. Based on this finding, this Court finds that this factor weighs in favor of finding that the force used was reasonable under the

14

circumstances and that defendant Campos did not use excessive force.

c.      *Relationship Between Need and Force Used*

This Court finds that the undisputed evidence shows that defendant used the O.C. grenade after the fighting inmates refused multiple orders to get down.  While plaintiff claimed at his deposition that defendant should have used pepper spray on the fighting inmates rather than the O.C. grenade, use of force expert Sergeant Watson opined that deploying the O.C. grenade under the circumstances, i.e., fighting inmate who ignored multiple verbal orders to get down, was the safer and more effective option to stop the fight because the O.C. grenade allowed defendant to maintain a safer distance while still applying the chemical agent.  Use of force expert Sergeant Watson opined that approaching actively fighting inmates to apply direct pepper spray would have posed a significant risk of injury to defendant and prolonged the fight.  Based on this undisputed evidence, this Court finds that this factor weighs in favor of finding that defendant Campos did not use excessive force.

d.      *Efforts to Temper Force*

In Furnace, the Ninth Circuit found that the defendants made an effort to temper the severity of their use of pepper spray by allowing the plaintiff to decontaminate and giving him medical treatment.  See 705 F.3d at 1030.  Accordingly, in considering defendant's efforts to temper his use of force, this Court considers whether defendant allowed plaintiff to decontaminate or gave plaintiff medical treatment.

In his declaration, defendant Campos addressed what occurred after he deployed the O.C. grenade:

> 12.  When the responding officers were placing the fighting inmates in restraints and securing the area, the building's exhaust fans were turned on and the outside doors 1 and 2 were opened.  I was later informed and believe that the fans were turned on and doors opened by the Facility A Control Booth Officer to begin decontamination of the affected area by ensuring proper ventilation of the building.  A large fan was also turned on to assist with blowing the contaminated air out of the building.
>
> 13.  Promptly after the area was secured and the fighting inmates had been escorted out of the building, which took approximately 10 to 20 minutes, my partner and I walked around to each cell in Facility A asking if any of the inmates needed to be released form their cell for

15

fresh air. The inmates who were inside cell numbers 113, 114 and 115 accepted the offer and were released from their cells to decontaminate with fresh moving air. During this time, my partner and I oversaw an inmate porter clean the area that was exposed to the OC powder with a mop and copious amounts of soapy water. Any inmate who needed cleaning supplies to clean their cell or replace linens or bedding was given the opportunity to request these items from the inmate porter. This concluded my involvement in the incident.

14. I do not know what cell inmate Calderon was in, but as a result of this litigation, I was informed he was in cell number 113, which was one of the cells that was released to receive fresh moving air.

15. At no time was I aware that inmate Calderon faced a serious risk of harm from being exposed secondarily to the OC powder, if he was.

16. None of the uninvolved inmates requested medical care. If an inmate had reported to me seeking medical care, I would have referred them to the medical clinic, and it would have been documented on a CDCR Form 7219.[4]

(ECF No. 88-2 at 3-4.)

In his declaration, use of force expert Watson addressed defendant Campos' actions after the deployment of the O.C. grenade:

8. Officer Campos' actions regarding decontamination were also within policy. CDCR policy at the time instructed that decontamination from OC may be accomplished by exposing the affected individual to fresh moving air, which was done when the inmates were released from their cells. See DOM, § 51020.15.5. Decontamination of the affected cell and housing unit should have been accomplished when it was "practical and safe to do so." See id. The alleged 20-minute delay in releasing the inmates from their cells was justified as this is consistent with the amount of time it would take to secure the scene and remove the suspect and victim. Releasing other inmates beforehand would have posed a serious safety risk. In my experience, uninvolved inmates may react negatively or even aggressively toward the inmates whose actions prompted the use of chemical agents. Allowing inmate movement before the area was secure and order restored could have jeopardized staff and institutional safety. Staff followed the proper decontamination protocols for the affected area by first ventilating the area to remove chemical agents followed by mopping the area with soapy water. Inmates are responsible for cleaning their own cells and should be afforded cleaning supplied and replacement items upon request.

9. As for medical care, there is no policy requiring a medical evaluation for all inmates who were exposed to chemical agents in a use of force incident, unless requested by the inmate. Based on the

---

[4] A "7219" refers to a CDCR form used to document injuries or unusual medical occurrences.

16

time of the incident, Calderon had multiple opportunities to go to medical and ask for a medical evaluation. If he had, medical staff would have conducted a medical evaluation and documented any reported injuries on a CDCR Form 7219.

(ECF No. 88-3 at 4.)

Section 51020.15.5 of the Department Operations Manual ("DOM") provides, in relevant part, "Decontamination from OC may be accomplished by exposing the individual to fresh moving air, or flushing the affected body area with cool water, e.g., shower, sink water, or wet cloths and providing clean clothing." (Id. at 14.)

At his deposition, plaintiff testified that after he was released from his cell, he went to the big fan to cool down because of the burning. (Plaintiff's depo. 33:19-22.) Plaintiff stood in front of the fan for five minutes. (Id. at 34:19-22.) Plaintiff also testified that a yard officer released him from his cell and was a little bit surprised that plaintiff had not been let out. (Id. at 41:2-9.) Plaintiff testified that when he was released from his cell, defendant Campos was sitting in a chair and laughing. (Id. at 41:17.) Plaintiff testified that he was released from his cell twenty minutes after the O.C. grenade was deployed. (Id. at 54:6-9.) Plaintiff testified that he was not seen by a nurse "per 7219" after the incident. (Id. at 55:13-14.) Plaintiff was asked several times regarding whether he was seen by a doctor for his injuries allegedly caused by the incident. (Id. at 36:6-25-38:1-3.) In response to these questions, plaintiff did not testify that defendant denied a request by plaintiff to see a doctor following the incident. At his deposition, plaintiff did not testify that defendant Campos denied his request to see a doctor following the incident. Based on the evidence set forth above, this Court finds that the evidence demonstrates that while defendant Campos did not offer plaintiff medical treatment after the incident, defendant Campos did not deny a request by plaintiff for medical treatment after the incident.

The undisputed evidence shows that defendant used the O.C. grenade only after the fighting inmates refused multiple orders to get down. This Court also finds that plaintiff has provided no evidence disputing defendant's evidence that the alleged twenty minute delay in plaintiff's release from his cell was caused by efforts made to ventilate the area of the dayroom exposed to the O.C. powder and for the responding officers to secure the area and remove the

17

fighting inmates.  While plaintiff testified at his deposition that the yard officer who released him from his cell was a "little surprised" that plaintiff had not been released and that defendant Campos was sitting in a chair laughing when plaintiff was released from his cell, plaintiff provides no evidence demonstrating that the alleged delay in his release from his cell was not caused by efforts to ventilate and secure the area.  This Court further finds that the undisputed evidence shows that plaintiff was allowed to decontaminate after he was released from his cell.[5] The undisputed evidence also shows that while defendant Campos did not offer plaintiff medical care after the incident, defendant Campos did not deny a request by plaintiff for medical care.  Based on this evidence, this Court finds that this factor weights in favors of finding that defendant did not use excessive force.[6]

e.      <em>Perceived Threat</em>

The undisputed evidence shows that defendant reasonably perceived the two inmates fighting as an imminent threat to the safety of the institution and that force was necessary to stop the fight after the fighting inmates refused multiple orders to get down.  Defendant's undisputed evidence also shows that defendant reasonably determined that use of the O.C. grenade was the safer and more effective option to stopping the fight.  Based on this evidence, this Court finds that this factor weighs in favor of finding that no excessive force was used.

///

---

[5]  Plaintiff does not challenge the adequacy of the decontamination he received.

[6]  In the summary judgment motion, defendant cites <u>Logan v. Ross</u>, 2011 WL 1752107, at *8 (C.D. Cal. Mar. 15, 2011), findings and recommendations adopted, 2011 WL 1750682 (C.D. Cal. May 9, 2011), in support of the argument that the twenty minute delay in plaintiff being released from his cell did not constitute excessive force in violation of the Eighth Amendment.  (ECF No. 88 at 15.)  In <u>Logan</u>, the plaintiff claimed that a twenty minute time period after he was exposed to pepper spray before he was decontaminated violated his Eighth Amendment right to adequate medical care.  <u>See</u> 2011 WL 1752107, at *3-4, 8.  The court in <u>Logan</u> found that the twenty minute delay did not state an Eighth Amendment claim because 1) the delay was caused by the prison's need to secure the two other inmates with whom plaintiff was fighting; 2) the twenty minute delay in taking plaintiff to a shower "hardly shows a knowing, cruel decision by any Defendant to increase plaintiff's pre-shower time; and 3) no one who is still a defendant was aware of the twenty minute delay.  <u>Id.</u>  While the reasoning of <u>Logan</u> is instructive, it is not entirely on point as it addresses an Eighth Amendment inadequate medical care claim and defendant Campos was apparently aware of the twenty minute delay that plaintiff experienced.

18

*f.      Conclusion*

All five factors discussed above favor a finding that defendant Campos did not use excessive force.  Accordingly, having considered these factors, this Court concludes that no rational trier of fact could find that defendant Campos used excessive force in violation of the Eighth Amendment when he deployed the O.C. grenade on June 7, 2023.  Defendant Campos should be granted summary judgment as to this claim.

**E.      Inadequate Medical Care Claim**

1.      Defendant's Motion

Defendant argues that plaintiff's Eighth Amendment inadequate medical care claim regarding decontamination fails because plaintiff was promptly decontaminated after the scene. (ECF No. 88 at 20-21.)  Defendant contends that plaintiff's deposition testimony contradicts plaintiff's claim that he was not offered decontamination.  (Id. at 21.)  Plaintiff testified that he was released from his cell to receive fresh moving air, including standing in front of a fan to decontaminate his body from the O.C. powder.  (Id. (see undisputed fact no. 26).)  Any inmate who needed cleaning supplies to clean their cell or replace linens or bedding was given the opportunity to request these items from the inmate porter.  (Id. (see undisputed fact no. 25).) Defendant also argues that the twenty minute delay in plaintiff's receipt of medical care was justified by securing the area and did not amount to deliberate indifference.  (Id. at 21.)

Defendant also argues that plaintiff's claim related to medical care fails because defendant was neither aware of nor involved in responding to plaintiff's request for medical care.  (Id.) Defendant argues that plaintiff's deposition testimony shows that plaintiff's complaint regarding medical care occurred long after defendant's involvement concluded.  (Id. at 22.)  Specifically, plaintiff only began feeling pain in his lungs and kidneys two to six months after the incident, and it was only then that plaintiff realized he needed medical care.  (Id. (see undisputed fact no. 35).) Defendant also argues that plaintiff cannot establish that defendant's conduct caused any actual injury because plaintiff's prior filings show that plaintiff never reported such injuries to medical staff. (Id. (see undisputed fact no. 37).)

///

19

2.      Plaintiff's Opposition

Plaintiff's arguments in opposition to defendant's summary judgment addressing inadequate medical care are the same arguments as raised in opposition to defendant's summary judgment motion addressing plaintiff's excessive force claim.

3.      Discussion

As discussed above, in the amended complaint, plaintiff claims he was not offered any decontamination.  (ECF No. 10 at 5.)  To the extent plaintiff bases his Eighth Amendment inadequate medical care claim on his alleged failure to be offered decontamination, this Court finds that defendant is entitled to summary judgment as to this claim.  As discussed in the section above addressing plaintiff's excessive force claim, plaintiff does not dispute that he was released from his cell to decontaminate with fresh moving air.  (ECF No. 88-2 at 3; plaintiff's depo. 33:19-22, 34:19-22.)  Any inmate who needed cleaning supplies to clean their cell or replace linens or bedding was given the opportunity to request these items from the inmate porter.  (ECF No. 88-2 at 3.)  Because it is undisputed plaintiff was offered decontamination, defendant is entitled to summary judgment as to this claim.[7]

To the extent plaintiff argues that the twenty minute delay in his receiving decontamination violated his Eighth Amendment right to adequate medical care, this Court finds that defendant is entitled to summary judgment as to this claim as well.  As discussed above in the excessive force claim section, the twenty minute delay in plaintiff's release from his cell to decontaminate was caused by efforts to ventilate and secure the affected area.  Based on this evidence, this Court does not find that defendant Campos acted with deliberate indifference by failing to release plaintiff from his cell before twenty minutes after he deployed the O.C. grenade. See Candler v. Prather, 2020 WL 2193264, at *4 (E.D. Cal. May 6, 2020), findings and recommendations adopted, 2020 WL 4349823 (E.D. Cal. Jul. 29, 2020) (twenty minute delay between pepper spray deployment and when plaintiff afforded a decontamination shower did not amount to deliberate indifference:  "Further, the fact that all of the foregoing was accomplished

---

[7]  Plaintiff does not raise a claim challenging the adequacy of the decontamination offered.

20

within twenty minutes also indicates that defendant was not consciously tarrying or slow-walking plaintiff to decontamination.").

Plaintiff also claims that defendant Campos violated his Eighth Amendment right to adequate medical care by failing to offer plaintiff medical care immediately following the incident. As discussed above, while it is undisputed that defendant Campos did not offer plaintiff medical care, it is also undisputed that defendant Campos did not deny a request by plaintiff for medical care. There is also no evidence in the record showing that defendant Campos had knowledge that plaintiff required medical care immediately following the incident. Based on this record, no rational trier of fact could find that defendant Campos acted with deliberate indifference.

For the reasons discussed above, defendant Campos is entitled to summary judgment as to plaintiff's Eighth Amendment inadequate medical care claims.

### F.    Qualified Immunity

Defendant argues that he is entitled to qualified immunity as to both of plaintiff's Eighth Amendment claims.

"The doctrine of qualified immunity protects government officials 'from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" Pearson v. Callahan, 555 U.S. 223, 231 (2009) (quoting Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982)). Qualified immunity shields an officer from liability even if his or her action resulted from "'a mistake of law, a mistake of fact, or a mistake based on mixed questions of law and fact.'" Id. (quoting Groh v. Ramirez, 540 U.S. 551, 567 (2004)).

"Determining whether officials are owed qualified immunity involves two inquiries: (1) whether, taken in the light most favorable to the party asserting the injury, the facts alleged show the official's conduct violated a constitutional right; and (2) if so, whether the right was clearly established in light of the specific context of the case." Robinson v. York, 566 F.3d 817, 821 (9th Cir. 2009) (citing Saucier v. Katz, 533 U.S. 194, 201 (2001), receded from, Pearson, 555 U.S. at 236 (the two factors set out in Saucier need not be considered in sequence.)). If the

answer to either inquiry is no, then the official is entitled to qualified immunity.  A right is "clearly established" when, "at the time of the challenged conduct, the contours of a right are sufficiently clear that every reasonable official would have understood that what he is doing violates that right." Ashcroft v. al-Kidd, 563 U.S. 731, 741 (2011) (quoting Anderson v. Creighton, 483 U.S. 635, 640 (1987)).

Taking the facts in the light most favorable to plaintiff, for the reasons discussed above, no rational trier of fact could find that defendant used excessive force in violation of the Eighth Amendment or provided plaintiff with inadequate medical care in violation of the Eighth Amendment.  For this reason, this Court need not address the second prong of the qualified immunity analysis.  See County of Sacramento v. Lewis, 535 U.S. 833, 841 n.5 (1988) ("[T]he better approach to resolving cases in which the defense of qualified immunity is raised is to determine first whether the plaintiff has alleged the deprivation of a constitutional right at all.").  Alternatively, therefore, defendant is entitled to qualified immunity for plaintiff's Eighth Amendment claims.

## VI.    PLAINTIFF'S MOTIONS

### A.    Motion for Transfer

On November 12, 2025, plaintiff filed a pleading docketed as "Motion for Transfer." (ECF No. 87.)  Plaintiff requests that he be transferred out of California or to Mexico or a third country based on his alleged failure to receive health care for the injuries suffered as a result of the June 7, 2023 incident, prison officials showing false reports about plaintiff to other inmates, his denial of access to his tablet device, and the Warden's failure to respond to his grievances. (Id. at 2.)  This Court construes plaintiff's motion for transfer as a motion for injunctive relief.

To obtain injunctive relief, the moving party must show: (1) a likelihood of success on the merits; (2) a likelihood of irreparable harm to the moving party; (3) that the balance of equities hardships tips in favor of the moving party; and (4) that an injunction is in the public interest.  See Winter v. Natural Res. Def. Council, Inc., 555 U.S. 7, 20 (2008).  Because this Court recommends that defendant's summary judgment motion be granted, this Court finds that plaintiff fails to demonstrate a likelihood of success on the merits.  In addition, in the civil rights action,

22

the Court does not have the authority to order plaintiff transferred out of California or to Mexico or a third country.  For these reasons, plaintiff's motion for transfer should be denied.

### B.    Motion for Reconsideration

On December 1, 2025, plaintiff filed a motion for reconsideration.  (ECF No. 90.) Plaintiff does not identify the order for which he seeks reconsideration.  (Id.)  For this reason, this Court  is unable to evaluate plaintiff's motion for reconsideration and orders this motion denied on these grounds.

### C.    Request for Law Library Access

Pursuant to the mailbox rule, on January 20, 2026, plaintiff filed a request for an order directing prison officials to grant him law library access.  (ECF No. 97 at 9.)  At the time plaintiff filed this request, defendant's summary judgment motion was fully briefed.  In this request, plaintiff does not clearly explain why he requires law library access as to the instant action. Accordingly, plaintiff's request for law library access is denied without prejudice.

### D.    Motion for Discovery

On February 7, 2026, plaintiff filed a motion for discovery.[8]  (ECF No. 104 at 8.) Plaintiff states that he is moving for "overlooked" discovery including written depositions and interrogatories.  (Id. at 1.)  Plaintiff appears to argue that his ability to conduct discovery was hampered by misconduct by prison officials.  (Id. at 1-5.)  Plaintiff's motion appears to have been brought pursuant to Federal Rule of Civil Procedure 56(d).   (See id. at 9.)

Federal Rule of Civil Procedure 56(d) provides that if a nonmovant shows by affidavit or declaration that, for specified reasons, it cannot present facts essential to justify its opposition to a summary judgment motion, the court may (1) defer considering the motion or deny it; (2) allow time to obtain affidavits or declarations or to take discovery; or (3) issue any other appropriate order.  Fed. R. Civ. P. 56(d).  "To prevail on a request for additional discovery under Rule 56(d), a party must show that '(1) it has set forth in affidavit form the specific facts it hopes to elicit

---

[8]  Plaintiff's motion for discovery does not contain a proof of service.  For this reason, this Court finds that plaintiff filed this motion on the date it was signed, February 7, 2026 (see ECF No. 104 at 8).  See Butler v. Long, 752 F.3d 1177, 1178 n. 1 (9th Cir. 2014) (noting that, in the absence of other evidence, courts generally deem a habeas petition filed on the date it is signed).

23

from further discovery; (2) the facts sought exist; and (3) the sought-after facts are essential to oppose summary judgment.'" Midbrook Flowerbulbs Holland B.V. v. Holland Am. Bulb Farms, Inc., 874 F.3d 604, 619–20 (9th Cir. 2017) (quoting Family Home & Fin. Ctr., Inc. v. Fed. Home Loan Mortg. Corp., 525 F.3d 822, 827 (9th Cir. 2008)).

Plaintiff's motion pursuant to Rule 56(d) is untimely as it was filed after defendant's summary judgment motion was fully briefed. See Mkrtchyan v. Sacramento County, 2023 WL 6961889, at *3 (E.D. Cal. Oct. 20, 2023) (motion by plaintiff pursuant to Rule 56(d) filed more than two weeks after plaintiff filed opposition to defendant's summary judgment motion deemed untimely); Garza v. Chavez, 2014 WL 3572148, at *2 (C.D. Cal. July 18, 2014) (finding that a pro se plaintiff's request to defer ruling on a summary judgment motion so that he could conduct additional discovery to be too late because the request was made two days after plaintiff filed his opposition brief); Martin v. Rubalcava, 2014 WL 794342, at *5 (E.D. Cal. Feb. 17, 2014) (denying plaintiff's 56(d) request and finding that plaintiff did not satisfy the requirements, in part, because the plaintiff filed his request after filing his opposition to defendant's summary judgment motion and after the defendant filed his reply brief). In addition, plaintiff's pending motion does not contain an affidavit setting forth the specific facts he hopes to elicit from further discovery, addressing whether the facts sought exist and whether the sought-after-facts are essential to oppose summary judgment. Accordingly, for these reasons, plaintiff's motion for discovery is denied.

### E.      Request for Judicial Notice

Plaintiff filed a pleading docketed as "request for judicial notice, (ECF No. 109.) Included within this pleading is a civil rights complaint. (Id. at 11-67.) If plaintiff intends to bring a new civil rights action, he must file a complaint in a new action. This Court disregards the complaint attached to the request for judicial notice because it is improperly filed. After the complaint, plaintiff attaches various documents to the request for judicial notice. (Id. at 68-120.) Plaintiff's purpose in submitting these documents is unclear. Accordingly, these documents are disregarded.

/ / /

## V.   CONCLUSION

Accordingly, IT IS HEREBY ORDERED that:

1. Plaintiff's motion for reconsideration (ECF No. 90) is denied.

2. Plaintiff's request for law library access (ECF No. 97) is denied without prejudice.

3. Plaintiff's motion for discovery (ECF No. 104) is denied.

4. Plaintiff's request for judicial notice (ECF No. 109) is deemed resolved.

Further, IT IS HEREBY RECOMMENDED that:

1. Plaintiff's motion for transfer (ECF No. 87) construed as a motion for injunctive relief, be denied;

2. Defendant's motion for summary judgment (ECF No. 88) be granted.

3. The Clerk of the Court be directed to enter judgment in favor of defendant.

These findings and recommendations are submitted to the United States District Judge assigned to the case, pursuant to the provisions of 28 U.S.C. § 636(b)(l).  Within fourteen days after being served with these findings and recommendations, any party may file written objections with the court and serve a copy on all parties.  Such a document should be captioned "Objections to Magistrate Judge's Findings and Recommendations."  Any response to the objections shall be filed and served within fourteen days after service of the objections.  The parties are advised that failure to file objections within the specified time may waive the right to appeal the District Court's order.  Martinez v. Ylst, 951 F.2d 1153 (9th Cir. 1991).

Dated:  July 2, 2026

_____
CHI SOO KIM
UNITED STATES MAGISTRATE JUDGE

Cald2049.sj/2

25